ADAMS. MR. BURGHUFF. May it please the court. We respectfully submit that the district court in this case committed a reversible error by granting summary judgment of obviousness and anticipated consequences. On obviousness, the district court failed to give credit to the significant evidence of commercial success of the claimed invention, as well as the copying of that claimed invention by the defendant Cadbury in this case. And a minimum factual issues regarding the secondary considerations should have precluded summary judgment. As to anticipation, we believe that the district court fell victim to hindsight and used the disclosure in Wrigley's 233 patent as a road map to pick and choose elements from the prior art to put them together into the claimed combination. We believe under this court's case law that that conclusion was wrong because there is no single reference that discloses the claimed combination as arranged in the claim without the need for undue experimentation. I'll start first with obviousness, if I may. The evidence we believe was clear that when Cadbury saw Wrigley's new gums that used the claimed invention, they were dismayed because they were losing market share rapidly to Wrigley's patented product. They analyzed Wrigley's gums every way they could. They reverse engineered it to figure out what the components were and determined that the cooling system was what is claimed in the Wrigley patent, WS23 plus menthol. They did consumer studies to see why Wrigley's gums were taking market share and what they found from their own documents is that it was the claimed invention of WS23 and menthol that was the key driver for consumer preference and was strongly correlated with consumers preferring the patented Wrigley gums over the prior art Cadbury gums. And then they did what apparently they felt forced to do by the marketplace. They copied Wrigley's patented invention. They reformulated virtually all of their gums to use as the cooling composition WS23 plus menthol. And then, lo and behold, once they copied the invention, their market share came back. But they also found, as they were entitled to do, that WS23 was in the prior art and it was known to have cooling properties. That's correct. But in the face of the unexpected benefits in the marketplace of using the claimed composition of WS23 plus menthol, it's not just WS23 alone that gives you the unexpected benefits of this strong consumer preference, it's the combination of WS23 plus menthol. That could not have been reasonably predicted by anything in the prior art. And indeed, the prior art combination that was relied on by the district court tells us that. The district court relied on the combination of Luo, which is a Cadbury patent that describes their prior art composition that lost in the marketplace of menthol plus WS3. They then combined that, the district court combined it with the Parrish reference, which discloses both WS3 and WS23. Well, Cadbury is the perfect example of why it was not obvious to want a skill in the art. They knew about WS23, in fact, before they filed their own patent application. And yet, they pursued in the marketplace and in their own patent application, doggedly, the use and disclosure of WS3 alone with menthol. So Cadbury and its scientists, who are above ordinary skill in this art, they're a very worthy competitor, they had all of the same information that the district court said rendered our invention obvious, and yet, Cadbury went down a very different path. It strikes me that both Parrish and also the Shahidi patent identify WS3 and WS23 as two specially preferred agents, essentially in conjunction, in a way that could at least plausibly lead a person's skill in the art to assume that now that WS3 is known to work with menthol, why not WS23? And perhaps that does create a prima facie case, Your Honor, and we are not, for purposes of this appeal, contesting the existence of a prima facie case. The question is, why doesn't it create a strong prima facie case of the sort that the court has held that in the case of a strong prima facie case, even secondary consideration evidence can't overcome it? Well, I think we can look at the Luo patent itself, which is the primary reference relied on by Cadbury and by the district court for the answer, because Luo tells us, this is at A2409, that while the precise reason that these cooling components, referring to WS3 and menthol, give an enhanced breath-freshening effect is not entirely understood. Each component is known to play a vital role. The presence of only one of these cooling components will not provide the desired results. So Luo itself, primary reference, Cadbury, was of the view that the selection of WS3 was critical, vital in its own words, and that really belies the existence of either a strong prima facie case based on Luo plus Parrish, because if your primary reference says WS3 and substituted paramethane carboxamides in the genus are vital, you then can't come over and erase that by referring to a reference that discloses both WS3 and WS23. I understood the passage from Luo that you were reading, and maybe I've not read it sufficiently closely, but I understood that to be saying that there is a synergistic effect between menthol and WS3, which would lead one to think, well, if there's a synergistic effect between those two, and from Parrish and Shahidi, we know that WS23 and WS3 are both, pretty close cousins, and they perform the same cooling effect. There may be a synergistic effect with WS23 as well. Wouldn't that be the inference you would draw from that language of Luo? Well, isn't that a kind of hindsight, too? I mean, that they chose to go down a particular path. If the science is out there, and for whatever reason Cadbury decided to pursue WS3, that doesn't mean as a legal matter you don't have obviousness and anticipation. Your Honor, I agree with that as a theoretical statement, but I think here it shows, since we now know in true hindsight that WS23 is the way to go, the marketplace has spoken clearly on that, that they were wrong in choosing the WS3 path. I'm just trying to figure out doctrinally where you're at, because you look at it from the point where the patent was issued, your patent was issued, what was known in the art at that time, not what was Cadbury doing later. It's almost like this is a secondary, another secondary consideration you're arguing. How did they behave? Well, I think it is, because that's the real world. It's easy for us now that we know what the magic invention is to look back in hindsight, and this is of course why the case law puts such strong emphasis on secondary, real world considerations, because it's easy to fall into that trap. Now we all know what we're looking for. Back then, nobody did. But let me just pursue that, because I'm a little more troubled at this point by the anticipation problem. Shahidi kind of gives you the combinations and permutations, and you point out in your brief, well, there are a lot of them, but you've also got a lot of scientists working on this. This is pretty important stuff to both of the parties here. Why isn't that enough to anticipate a path? Let me address Shahidi, and then I'll probably be eating into my rebuttal time. Shahidi only gets you to our claimed combination through hindsight. An ordinarily skilled reader picking up Shahidi would say, okay, I need to have these two essential components, neither of which are relevant to our claims, isletol and glucosinate, I'm probably mispronouncing that. Then we get over to a very long list of optional potential ingredients. Cooling agents, fluoride compounds, humectants, polishing materials, surfactants, thickeners, stannous salts, coloring agents. I haven't hit them all yet. Both of the ingredients in our claim are optional. What would have to happen is a skilled reader picking up Shahidi would have to say, I'm going to put a cooling agent in my composition, even though Shahidi discloses thousands, if not millions of compositions that do not include a cooling agent, because it's optional. And then, after deciding to put in a cooling agent, would have to pick our particular cooling agent, and then would have to move over to a different menu or a different column and say, I'm going to include a flavoring agent, even though there are thousands, indeed millions of compositions within the four corners of Shahidi that wouldn't include a flavoring agent, let alone include both a cooling agent and a flavoring agent, and then I have to pick menthol as my flavoring agent. That defies the odds, unless one has the patent, has a roadmap, and is doing that analysis in hindsight. But whittling down the number of choices, it seems to me, from Shahidi is Shahidi's reference to the WS-3 and WS-23 as particularly preferred cooling agents. They had a third one, TK-10, I think it is. That's correct, Your Honor. But certainly, there's a very small number of cooling agents, so if I am considering trying to get a cool flavor, one of my flavors that I'm interested in might be the menthol flavor, then Shahidi certainly gives me a pretty narrow collection of choices, it seems to me. If, in hindsight, you decide that you are going to include an optional cooling agent and an optional flavoring agent, there's no disclosure. The problem I'm attempting to solve, hypothetically, is to get a cool-flavored gum, and it seems to me that the combination is pretty... this is a solution to that problem that gives me pretty good direction, doesn't it? I respectfully disagree. I think that is hindsight, and there is nothing in Shahidi that picks out menthol and puts it together with WS-23. Nothing at all. And yet, in the real world, we know that that combination has surprising, unexpected benefits of consumer preference. Who would have known that? Nobody reading Shahidi at the time, without our patent as a roadmap, would have come to that conclusion. It's only hindsight that gets us there. Let's hear from the other side, and we'll save you a few minutes. Thank you, Your Honor. Thank you, Your Honor. May it please the Court. I'd like to address the Shahidi anticipation argument to start, but I think the facts I'm going to address at the very beginning embrace both theories of invalidity. I want to note, as an initial matter, that this Court, after a fairly long discovery and summary judgment process, carefully looked at the entire record and evaluated the evidence precisely as this Court has dictated district courts to do so, and wrote a very detailed 65-page decision evaluating and considering carefully and objectively all the evidence submitted by Wrigley, all the arguments at that time submitted by Wrigley, and the arguments presented by Cadbury, and concluded rather strongly that Claim 34 was invalid for two separate reasons, and it is the proper decision in this case. The three facts that are uncontested, they will not contest this, is that Claim 34 is incredibly broad. It covers every mentholated gum that uses WS-23 in the marketplace under practical considerations. There's no question about that. It has no functional limitation. It doesn't even describe the need to be cool. It just says a flavoring agent, which is everything for chewing gums. Chewing gums are always flavored. Having said that, it has certain limitations of ranges that covers practically the entire universe of chewing gums. It covers every mentholated gum that uses WS-23. That's correct, essentially. The second point is that at the time of the invention or alleged invention by Wrigley, WS-23 had just received FEMA GRAS approval. Formulators don't use chemicals such as this, somewhat sophisticated organic molecules such as the Wilkinson Sword series, unless they're FEMA GRAS approved. You don't market products with that. In 1996, it's FEMA GRAS approved. In 1997, they start formulating with it. That is a key fact they don't dispute and, obviously, a driving decision going forward that has nothing to do with innovation. The record here is undisputed that numerous references around the time before Wrigley's alleged invention discussed extensively the interchangeability of WS-3 and WS-23. Now, we've only cited the Parrish article for the theory on obviousness, but Shahidi says the same thing. Furman patent, which is another Procter & Gamble patent, says the same thing. Throughout that entire record, there's nothing that says to the contrary. There's nothing suggesting out there that you would not put WS-23 in a chewing gum where you use WS-3. Certainly, neither of the patents that are identified and the work that was done by Cadbury with WS-3 suggests that you should not include or you should not try to substitute out WS-3 and use WS-23. In fact, WS-3 has been used over two decades now by Cadbury throughout the entire period. So, they say it's failed in the marketplace. That's not correct. Getting to the Shahidi reference, when you get down to it, you're talking about three particularly preferred cooling agents, 23 flavoring agents, one or more of them. When you do the math, you're talking about 69 combinations of chewing gums. There's an example, 10 through 13 in Shahidi are example formulations that meet claim 34 except for the flavoring agent combination. Once you take that and the recognition that persons skilled in the art are easily capable of doing under 70 experiments just to test all of the possible combinations, as the district court correctly found. Remember, this was their burden to come back and say, undo experimentation. They needed to demonstrate that there was going to be such excessive and complex experimentation that under this court's precedence, it was undue and they failed. The notion that because a reference refers to dozens of other possibilities, toothpaste, mouthwash, and lots of different things, humectants and things like that that might be used in those other combinations, that you might have a million possibilities that don't include this, that's not the test. Persons skilled in the art would never look at those if they're looking to make a flavored chewing gum, which is the problem that was being solved by claim 34. Was the problem being solved to make a flavored chewing gum or to make a menthol flavored chewing gum? Well, I always kind of looked at what the claims actually attempted to cover and obviously the claims covering a mentholated chewing gum. In the chewing gum industry, I don't know what the percentage is, but a vast majority of chewing gums include menthol or menthol, peppermint oil is loaded with menthol, spearmint oil, things like that. But I think that the way the claims expressed a flavored gum was really the objective and the notion that persons skilled in the art would recognize that menthol is a very, very common formula and component of flavored chewing gums. It would be easy to reach that as one of the very first things you try when you are making these formulations. Where I'm going with the question, of course, is that in this array of flavorings that is set forth in Shahidi, if you had a gum fabricator who is looking at Shahidi, your argument with respect to some of the other parts of Shahidi is that the gum fabricator would ignore them. Would the gum fabricator also ignore some of the flavorings or are those flavorings that would be equally suitable for gum as for toothpaste or anything else? I think that there's obviously important flavors for gum. The mints are recognized and also the menthol is an important flavor and others like clove. Is there anything in the record that would support that kind of winnowing? There is a lot of discussion in the record about the importance of using menthol and chewing gums in the patents themselves and in details about how menthol plays a critical role but has these problems. The efforts have been over the last few years to somehow cut back on the bitterness of menthol but still take advantage of its coolness up front. I'd like to, if I could, just wrap up on Shahidi by offering, there's a case that came out a while ago but it seems in a rebuttal to their arguments and their reply. It's the in-repeatering decision and I can hand up a copy or just read it into the record but it talks about multiple lists with variables and when the amount is... I'll just read this right here. This is a case in this court? It's a CCPA. It's a decision from 1962. It's an organic molecule with R groups around it. It's not in my brief, unfortunately. It describes the possibility of two or three lists but because the numbers of variables for each list, the total was about 20 and they found anticipation because the number was so small. I contrast that... Is this your primary argument as to why this is not hindsight selection? It's one of the arguments against undue experimentation but I think the guidance and the information that's provided in Shahidi also provides, not just the raw numbers. I think that the court recognized that the fact that Shahidi goes in some detail about what's preferred and what's particularly preferred and talks about and provides a chewing gum example with 1.5% flavor and then person, the recognition that person skilled in the art would understand that that would necessarily embrace as a significant possibility menthol and ultimately... And the real key thing on undue experimentation, I apologize, is adding these flavors and cooling agents to chewing gum, it's detailed in there how to do it and people skilled in the art know how to do it. They've been doing it for a long time. And the patents that are incorporated into Shahidi as noted by the district court clearly embrace that. And so that was why the no undue experimentation really didn't have any traction as a defense against the anticipation. There's no debate that it's disclosed. So to generalizations, what we will welcome your guidance on is why in this particular case on these facts based on the prior art and in your view you tell us 69 combinations that it was not undue experimentation and that is your position also that the prior art would have led the experimenter to this combination? Yes. Where in the prior art? Well the prior art is the Furman reference would be a perfect example because Furman talks about using WS3, WS23 and menthol in combination as a cooling compound in chewing gum and so that prior art clearly leads person skilled in the art into that. What's your response to Mr. Burgo's statement that if it was so obvious how come your client missed it? Well our companies are constantly reviewing and adjusting their formulas. They do it every couple of years and so when it got down to a cycle and we're always looking at each other's gums as they did in 1997 and discovered our use of WS3, it's a process that continues to go forward. In the context of our review, we concluded that Wrigley had invested a significant amount of money in developing all sorts of new things in their chewing gum, advances on their sweetener, advances on their gum base and in the process came up with a better chewing gum of which a very minor part as we described in our reports had to do with the new use of WS23. WS23 had just recently been Femagrass approved. Our formulators were now starting to work with it too. So we came out with products that included WS3 and WS23 and menthol. We felt completely entitled to do that and had no knowledge of the 233 patent, did not copy any of their formulas. We had our own brands, our own formulations. The only thing they're pointing to is an incredibly broad claim and saying, you copied it. Everybody would copy it if they ever used WS23. So it's not a fair analysis at all. But more importantly, what they're trying to do, and you heard this in his last comment, he says, our particular cooling agent, they're taking proprietary rights on WS23 per se. They're saying that's theirs. And it's not. It was invented by somebody else. And its invention by somebody else was specifically identified for use in chewing gum. So it's not fair to suggest that somehow they're now entitled to embrace it. Because let's assume, and perhaps one of the reasonable inferences at the district court was WS23 was slightly better than WS3 in certain formulations. Maybe that was a reasonable inference based on the evidence that should go to Wrigley. I'm not so sure it's true. However, even in view of that inference, they don't own it. They're only entitled to an invention if they can demonstrate any of the commercial success or any of the copying was tied specifically to the use of WS23 and any benefit with it in combination with menthol. That would be something that they could present as an objective initiative of non-obviousness. They didn't present that. They're a sophisticated company. They have a lot of good researchers. They could have done the science and done an apples to apples comparison. One gum with WS3, one gum with WS23 and tease out the difference from the two combinations and see if there really was a synergistic advantage with menthol with WS23. They never did it. Certainly our data wasn't looking at that. We were comparing very sophisticated products to market for packaging and sweetness and a bunch of other qualities and found that that was insufficient, that our products needed to be enhanced. And we did. So I keep going back to, sure, objective evidence is important on one level, but certainly science is critical and the only test of record that identify and point out the science behind and do a direct apples to apples comparison show the parity and interchangeability of WS23 and menthol in a chewing gum. I've gone way beyond that. The trial court found, you mentioned the Furman patent, the trial court did not find anticipation based on Furman. No, we argued that that was a mistake by the trial court. What was the problem? Well, the trial court acknowledged that conventional chewing gums would include the ranges of base and sweetener identified in claim 34, but they felt that because Furman didn't expressly identify those ranges, I think the mistake by the trial court is they felt that Furman needed to anticipate the entire range. And with all that's needed for anticipation by Furman is to fall within the range of a conventional chewing gum. And if that's true, and I think the record was clear that it was. All right. Thanks. Thank you. We assume that you're going to leave your cross appeal on the brief. I would like to bring it up, but I have about 30 seconds. Can you? I reserve time. Can I reserve and try about a minute or two? You used it up, I'm afraid. All right. We'll check that on the brief. Let me just touch one point on the cross appeal then. Okay. The real thrust is the disclaimer argument where the court noted language that was limiting and then misapplied it to limit much beyond what the limitations were presented. And the important fact on that disclaimer language that they pointed to, this use of either alone does not work, is they thought alone in a formulation that included other things, other cooling agents possibly, and therefore excluded that. But in fact, it included as the test data show, the use of menthol by itself as the only cooling agent or WS3 by itself as the only cooling agent. That's all that was disclaimed. And so the broad disclaimer was an error which I think affected the decision. Thank you for your time. Mr. Berghoff? I'll try and cover points quickly. First on Shahidi and anticipation, I believe this court's impacts case is directly on point. In impacts, you had two lists, neither of which was optional. So actually, it's a distinction in our favor. But in impacts, you had a list of preferred chemical compounds, one of which was riluzole, and you had a list of diseases that could be treated with those compounds. And this court affirmed a finding that a prior art reference that had listed riluzole in column A and ALS in column B, nonetheless, was not anticipating because it lacked enablement, because nothing in that prior art patent brought together riluzole and ALS. It's the same situation here. Well, there's a different factual context though, isn't there? Of course. Chewing gum, everybody in the room here is combining cooling agents and these compounds. That's the art we're talking about. But the question is, is there anything in Shahidi that gets one of ordinary skill in the art to the specific combination? We believe our claim is quite specific and narrow. You have to have menthol. You have to have WS-23. And there is nothing, we believe, but hindsight that gets you there because you have to make so many assumptions to even drill down far enough to put those two compositions together. So I believe impacts is really spot on on the factual scenario of having to pick and choose using our patent as a roadmap improperly to end up with the claimed combination. I want to address the parish reference just briefly in the obviousness context. This was Luo plus parish. Parish, at best, or there should be a question of fact, we believe at best says substitute one of our compositions, WS-3 or WS-23, for menthol because menthol has disadvantages. And that's laid out right in the opening paragraphs of parish. So at best, parish is saying use our compounds instead of menthol. It does not lead one to the conclusion that one should partially substitute either compound, WS-23 or WS-3, for menthol or use it in combination with menthol. We heard counsel for Cadbury say that Cadbury did not copy Wrigley's gum formulation. The evidence is clearly to the contrary. At a minimum, that should create a fact issue that should have precluded summary judgment. The evidence is clear that they tested, they reverse engineered our formulation, they tested it. Consumers preferred it 2 to 1 to 3 to 1 over the prior art formulation in their gums with WS-3. And that is powerful evidence of the real world impact of our claimed invention. When you say the evidence is clear that they tested it and reverse engineered it, before they introduced the product? Yes, before. The sequence of events is very clear. Wrigley launches its gums with WS-23 and menthol. They take significant, surprisingly quickly, take significant market share. They reverse engineer our gums to find out what the heck is going on. They determined that it was WS-23 and menthol that were, their words, the key drivers for consumer preference. Then, and only then, did they reformulate their gums to include our patented invention. A clear, clear case of the recognition of the value and the surprising nature of our claimed combination. I would be happy to answer additional questions. Any more questions? No, except that you may want to raise the confidentiality issue. This is one of the cases we've had multiple times. Yes, would both counsel please approach the podium. We want to raise the question of the designations of confidentiality in the briefs. They are so widespread, it makes our role of writing an opinion quite difficult. So I'd like to ask you both together, we don't know who designated what, it's just altogether, to take a very sharp pencil and go through the briefs and see if you can liberate much of the information. Tell us what is authentically confidential and a trade secret. We shall. We'll do that. Would a joint letter to the court be sufficient or would you prefer us to resubmit the briefs? If it's easier for you to redo and resubmit the briefs. We'll do that. With the help of machinery. Is that alright with everybody? If they get down to almost nothing, a letter would work. Do whatever is easier for them. We'll try and decide what's easier for the court and go down that path. Thank you both so much. Thank you very much. The case is under submission.